UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GWENDOLYN NATASHA FULLER,

                Plaintiff,

        v.

SCHOOLCRAFT COLLEGE, a
Constitutional Corporate and Federally Funded
Public Education Institution; DR. JOY
POLLARD, individually and in her official
capacity; JAMES POLKOWSKI, individually
and in his official capacity; RICHARD
WEINKAUF, individually and in his official
capacity; GLENN CERNY, individually and in
his official capacity; jointly and severally,

                Defendants.

_____/

Civil Action No. 2:11 cv 15710

District Judge Stephen J. Murphy, III
Magistrate Judge Laurie J. Michelson

**REPORT AND RECOMMENDATION TO GRANT IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [15]**

       Plaintiff Gwendolyn Natasha Fuller ("Plaintiff") brings a 99-page, 19-count Complaint (Dkt. 1) against Defendant Schoolcraft College and four of its administrators, Dr. Joy Pollard, James Polkowski, Richard Weinkauf, and Glenn Cerny (collectively "Defendants"), for alleged federal and state law violations that occurred during Plaintiff's admission to the Schoolcraft College nursing program and her 4-month tenure as a student there. On February 6, 2012, District Judge Stephen J. Murphy, III referred all pretrial matters to this Court. (Dkt. 8) On April 17, 2012, Defendants filed a Motion for Summary Judgment. (Dkt. 15) Plaintiff responded (Dkt. 20), and Defendants filed a reply (Dkt. 21). The Court has carefully considered the parties' submissions and will dispense with oral argument. *See* E.D. Mich. LR 7.1(f)(2).

For the following reasons, the Court RECOMMENDS that Defendants' Motion for Summary Judgment be GRANTED as to Plaintiff's federal law claims. The Court further finds it appropriate to decline supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c) and RECOMMENDS that those claims be dismissed without prejudice.

## I.    BACKGROUND

Plaintiff, Gwendolyn Fuller, applied to Schoolcraft College's nursing program ("the Program") on March 16, 2009. Because the deadline for applications for the entering class of 2009 was on March 15, 2009, Schoolcraft advised Plaintiff that it would hold her application for review with the Spring 2010 applicant pool. In May 2010, Schoolcraft began reviewing Plaintiff's application. As part of the application, Plaintiff submitted an "Applicant Statement Regarding Criminal History Pending Criminal History Check" (hereinafter "Criminal History Statement") (Dkt. 15, Defs.' Mot. Summ. J., Ex. 2, Pg. ID 179.) By signing the Criminal History Statement, Plaintiff attested to the following:

> I hereby state that as an adult, I have not been convicted of or am not currently under investigation/court action for the commission [of] *any* of the following:
>
> (a)    A felony or an attempt or conspiracy to commit a felony *within the 15 years immediately preceding the date of this application* for admission to any of the Schoolcraft College nursing programs per Michigan Public Health Code, Public Act 368 of 1978 as amended.
>
> (b)    A misdemeanor involving abuse, neglect, assault, battery, or criminal sexual conduct or involving fraud or theft against a vulnerable adult as that term is defined in section 145m of the Michigan Penal Code, 1931 PA 328,

> MCL 750.145m[1], or a state or federal crime that is substantially similar to a misdemeanor described in this statement *within the 10 years immediately preceding the date of this application* for admission to any of the Schoolcraft College nursing programs per Michigan Public Health Code, Public Act 368 of 1978 as amended.

(*Id.*) (emphasis in original).

By signing the Criminal History Statement, Plaintiff further understood and agreed

> . . . that, if the criminal history check does not confirm these statements, my admission and clinical privileges will be terminated by the College as required under Public Health Code Act 368, Section 20173 unless and until I can prove that the information is incorrect.  The College shall provide a copy of the results of the criminal history check to me upon written request[;] . . .

> that failure to meet any conditions described above of this statement may result in the termination of my nursing classes and clinical privileges and that those conditions are good cause for termination[;] [and] . . .

> that an individual who knowingly provides false information regarding criminal convictions in this statement is guilty of a misdemeanor punishable by imprisonment for not more than 90 days or a fine of not more than $500.00, or both.  (MCL 333.20173(9))[.]

---

[1] Mich. Comp. Laws 750.145m defines "vulnerable adult" as 1 or more of the following:

i) An individual age 18 or over who, because of age, developmental disability, mental illness, or physical disability requires supervision or personal care or lacks the personal and social skills required to live independently; or
(ii) A person 18 years of age or older or a person who is placed in an adult foster care family home or an adult foster care small group home; or
(iii) A vulnerable person not less than 18 years of age who is suspected of being or believed to be abused, neglected, or exploited. (*Id.*)

(*Id.*)

Plaintiff submitted her Criminal History Statement on June 16, 2010, however, she failed to meet the June 21, 2010 deadline for submitting other pre-registration requirements.   Thus, Schoolcraft sent  Plaintiff a cancellation letter on July 1, 2010. (Dkt. 15, Defs.' Mot. Summ. J., Ex. 3, Pg. ID 181.)  Plaintiff's file, including the Criminal History Statement, was thereafter moved to the "Withdrawn/Cancelled Students File."   As a result, Plaintiff was no longer considered an accepted student, so her Criminal History Statement was not sent to the College Finances and Business Services Department which processes the criminal background checks.  At some later date, Plaintiff complied with the procedures set forth in the Student Handbook and requested an extension to complete the pre-registration items.   Schoolcraft granted Plaintiff's request and Plaintiff was conditionally readmitted into the nursing program on or about August 3, 2010. (Dkt. 15, Defs.' Mot. Summ. J., Ex. 4, Pg. ID 183.)

No one at Schoolcraft noticed that Plaintiff's Criminal History Statement had not been processed until it was discovered in her file in mid to late December 2010.   At this time, the Criminal History Statement was sent to the College Finance and Businesses Services Department which, in turn, requested a criminal background check on Plaintiff from the Internet Criminal History Access Tool ("ICHAT").   On or about December 20, 2010, ICHAT provided to Schoolcraft a copy of Plaintiff's criminal background history.  (Dkt. 15, Defs.' Mot. Summ. J., Ex. 5, ICHAT Report, Pg., ID 185-88.) The ICHAT report provided the following information regarding Plaintiff's criminal history:

      1.      INCIDENT DATE: 12/26/1996:  CHARGE SEGMENT: December 26, 1996, Charge of Felony Retail Fraud - First Degree (Count 1); JUDICIAL SEGMENT: January 8, 1997, Misdemeanor Retail Fraud (Count 2).  (*Id*.)

4

2.      INCIDENT DATE: 03/06/1997: CHARGE SEGMENT:   March 6, 1997, Felony Retail Fraud (Count 1); [ ]; JUDICIAL SEGMENT: June 5, 1998, Felony Retail Fraud - Pled Guilty (Count 1); Attempt-Misdemeanor Retail Fraud - First Degree - Pled Guilty  (Count 2). (*Id*.)

3.      INCIDENT DATE: 1/21/2005: CHARGE SEGMENT: January 21, 2005, MCL 750.145 - Misdemeanor Children - Contributing to Delinquency (Count 1); JUDICIAL SEGMENT: March 10, 2005, MCL 750.145 - Attempt - Misdemeanor Children - Contributing to Delinquency - Pled Guilty (Count 1).  (*Id*.)

4.      INCIDENT DATE: 01/21/2005: JUDICIAL SEGMENT: Ordinance Violation - Disobey Policy Officer - Pled Guilty (Count 1).  (*Id*.)

The 2005 misdemeanor conviction was based on Plaintiff's alleged neglect of her then four-year old son whom she had left in an unattended car in a flea market parking lot in thirty-degree weather.  (Dkt. 15, Defs.' Mot. Summ. J., Ex. 7, Warren Police Dep.'t Incident Report, Pg. ID 194.) All of these convictions occurred within the State of Michigan.

On February 10, 2005, Plaintiff applied for reciprocity from the State of Michigan of her Louisiana practical nurse license.  (Dkt. 15, Defs.' Mot. Summ. J., Ex. 6, Application for Practical Nurse License, Pg. ID 190-91.)  As  part of the application, Plaintiff indicated  that she had been convicted of a felony.  (*Id*., Pg. ID 190.)

Upon receiving the ICHAT report, on December 21, 2010, the Dean of Schoolcraft's Nursing Department, Defendant Dr. Joy Pollard ("Dr. Pollard"), sent Plaintiff an email requesting that Plaintiff "make an appointment to see [her] tomorrow 12-22-10 before [3:00 p.m.]" (Dkt. 15, Defs.' Mot. Summ. J., Ex. 8, Pollard Email, dated Dec. 21, 2010, Pg. ID 209.)  The email continued: "This is a matter of the utmost importance."  (*Id*.)  Plaintiff did not respond to Dr. Pollard's email request to set up a meeting and, as a result, on December 22, 2010, Schoolcraft sent Plaintiff a letter

terminating Plaintiff's continuation in the School's nursing program. (Dkt. 15, Defs.' Mot. Summ. J., Ex. 9, Pollard Letter, dated Dec. 22, 2010, Pg. ID 211.) Schoolcraft cited three reasons for its decision to terminate Plaintiff:

(1)     Background check reveals criminal felony conviction within 10 years;

(2)     Misdemeanor conviction for 750.145 within 10 years;

(3)     Falsification of applicant statement regarding criminal history signed by Plaintiff on 6-16-2010.

(*Id*.)

After receiving Schoolcraft's termination letter, on December 31, 2010, Plaintiff sent an email to Dr. Pollard disputing her convictions, and stating that she would be taking legal action against Schoolcraft. (Dkt. 15, Defs.' Mot. Summ. J., Ex. 10, Fuller Email, dated December 31, 2010, Pg. ID 214-15.) Plaintiff also indicated in her response, that it was not until Dec. 31, 2010 that she saw Dr. Pollard's Dec. 21, 2010 email, requesting that Plaintiff make an appointment on December 22, 2010 . (*Id*., Pg. ID 214.) Dr. Pollard forwarded Plaintiff's email to the Dean of Student Services, Cheryl Hagen, because Dean Hagen had a previously scheduled January 4, 2011 meeting with Plaintiff to discuss another matter. (*Id.*; *see also* Dkt. 15, Defs.' Mot. Summ. J., Ex. 12, Telephone Log of 1/4/11 meeting, Pg. ID 219.) Plaintiff, however, did not attend the meeting with Dean Hagen on January 4, 2011. (*Id*., Pg. ID 220.). To date, Plaintiff has not presented any records to Schoolcraft in an attempt to correct her criminal history as allowed by Schoolcraft's Student Right's Policy, or to appeal Defendants' termination decision; instead, Plaintiff filed this suit seeking $5,500,000.00 in damages. (Dkt. 1, Complaint.)

## II.     STANDARD OF REVIEW

A motion for summary judgment is appropriate if the record shows that there is no genuine

6

issue as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  In analyzing the motion, the Court draws all reasonable inferences in favor of the non-moving party and construes all evidence in a light most favorable to the non-movant.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A), (B); *see also Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). In opposing the motion, however, "the mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *See Anderson*, 477 U.S. at 252.  Indeed, a party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

If the non-moving party, after sufficient opportunity for discovery, is unable to meet his burden of proof, summary judgment is clearly proper. Fed. R. Civ. P. 56(e)(3); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim.  *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics*

& *Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

## III.   ANALYSIS

Plaintiff asserts seven federal and 12 state law claims in her Complaint.  For the reasons discussed below, the Court recommends dismissal of these claims.

### A.   Federal Claims

Plaintiff's federal claims include: 1) Freedom of Speech – Retaliation (42 U.S.C. § 1983); 2) Procedural Due Process (42 U.S.C. § 1983); 3) Equal Protection (42 U.S.C. § 1983); 4) Substantive Due Process (42 U.S.C. § 1983); 5) Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1985); 6) Denial Equal Educational Opportunity Prohibited (20 U.S.C. § 1703(d)); and 7) Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g).  The Court addresses each claim in turn.

### 1.   Freedom of Speech - Retaliation

Plaintiff claims that Defendants violated her First Amendment rights by retaliating against her for attempting to speak out about being treated unfairly in the nursing program.  To prevail on her retaliation claim, Plaintiff must establish the following: "'(1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.'" *Zwick v. Regents of the Univ. of Michigan*, No. 06-12639, 2008 U.S. Dist. LEXIS 34472, at *25 (E.D. Mich. Apr. 28, 2008) (quoting *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001)).

First, "[i]n the absence of a specific showing of constitutionally valid reasons to regulate

their speech, students are entitled to freedom of expression of their views." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969). Students' expressions will generally be protected as long as they do not "materially and substantially interfere with the requirements of appropriate discipline" or collide with the rights of others. *Id.* at 513. Here, Plaintiff complained about her treatment in the nursing program. For example, in July 2010, Plaintiff sent an email to the school suggesting she was being treated unfairly. (*See, e.g.,* Pl.'s Resp. to Mot. Summ. J., Ex. B, Pg. ID 417.) In September 2010, Plaintiff was upset about not receiving email correspondence regarding clinical rotation schedules and again sent an e-mail to the school indicating that she felt like "this is personal and borderline discriminatory." (*Id.*, Pg. ID 418.) Plaintiff was also involved in a verbal confrontation with a student in November 2010 where Plaintiff describes herself as being "harassed by other students." (*Id.*, Pg. ID 420.) Plaintiff brought this matter to the attention of Defendants who immediately asked Plaintiff to set up an in-person meeting to discuss what Defendants deemed "serious allegations." (*Id.*, Pg. ID 421.) While Plaintiff indicated that she wanted to meet to discuss her concerns, she advised that she needed to concentrate on an upcoming exam and asked to meet after the exam. (*Id.*, Pg. ID 421-22.) It appears that Plaintiff and Dr. Pollard did meet to discuss Plaintiff's concerns on December 2, 2010. (*Id.*) Thus, "as Plaintiff's speech was not obscene or necessarily disruptive and was actually quite important . . . it is constitutionally protected speech." *Zwick*, 2008 U.S. Dist. LEXIS 34472 at * 27.

Additionally, the Court finds that dismissal of Plaintiff from the nursing program would have the effect of chilling this type of speech at Schoolcraft.

Plaintiff, however, has not demonstrated a genuine issue of material fact on the final element of a retaliation claim – that her termination was motivated, at least in part, as a response to the

9

exercise of her constitutional rights.  Plaintiff has simply not come forward with any evidence linking her complaints about the nursing program to Defendants' decision to dismiss her from the program.  To the contrary, the undisputed evidence supports Defendants' position that the dismissal was based on the reasons given in Defendants' December 22, 2010 dismissal letter – i.e., her dishonesty regarding her criminal history.  In fact, Plaintiff has not directed the Court to anything in the record, nor has the Court's review uncovered anything, suggesting a personal animus against Plaintiff by any of the individually-named Defendants.  Again, to the contrary, upon learning about the incident of alleged harassment, Dean Pollard responded to the report in a professional and responsive manner.  (Pl's Resp. to Mot. Summ. J., Ex. C, Pg. ID 421 (requesting an immediate, in-person meeting with Plaintiff to discuss the serious allegations).)

Plaintiff claims that a causal link can be shown by a temporal connection between her protected expression and the Defendants' decision to dismiss her from the nursing program. Plaintiff raised concerns about alleged unfair and discriminatory treatment in the nursing program starting in July 2010 up until her meeting with Dean Pollard on December 2, 2010.  These communications took the form of a few email exchanges, a meeting with one of her clinical instructors, and the December 2 meeting with Dean Pollard.  (Pl.'s Resp. to Mot. Summ. J., Exs. B & C).   While in some cases temporal proximity might be sufficient to form an inference of retaliatory motive, in this case, because of the reasons given in the dismissal letter, no reasonable jury could find retaliatory motive based on temporal proximity alone without additional evidence that Plaintiff's protected speech served as a motivation for Defendants' decision to dismiss her, or bothered Defendants in any way.  *See Zwick*, 2008 U.S. Dist. 34472, *28-29; *see also Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (concluding that "[s]ubstantial case law

from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone."); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000) (temporal proximity must be considered along with other evidence of retaliatory conduct for a causal connection to be found); *cf Sullivan v. Coca-Cola Bottling Co.*, 182 Fed. App'x, 473, 480 (6t h Cir. 2006) ("bare allegations are insufficient to establish a causal connection[.]").

Because she cannot satisfy the causal connection element,  Plaintiff's retaliation claim fails as a matter of law.

### 2.      Procedural Due Process

Plaintiff claims that she was not afforded adequate procedural due process when Defendants terminated her from the nursing program.  The issue of whether a student's continued enrollment at a post-secondary institution is protected by procedural due process is still an open question. Courts, for the main part, however, have assumed for the sake of argument, that such an interest exists. *See, e.g., Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84-85, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978); *Bell*, 351 F.3d at 249.  While the Court has some concerns about Plaintiff's expeditious termination, even when the facts are viewed in a light most favorable to her,  the record reveals that Defendants provided her with adequate procedural due process.

#### a.      academic v. disciplinary termination

The U.S. Supreme Court has made clear that the key due process factors are: 1) notice, and 2) an opportunity to be heard.  *See Goss v. Lopez*, 419 U.S. 565, 579, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975).  How these factors are analyzed, however, depends on the nature of the termination.

The Supreme Court clarified in *Horowitz* the need for flexibility in procedural due process standards where a student's dismissal is academic and not disciplinary.  It noted, "the significant

difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct.  This difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Horowitz,* 435 U.S. at 86.  The Court in *Horowitz* concluded, "[after] considering all relevant factors, including the evaluative nature of the inquiry and the significant and historically supported interest of the school in preserving its present framework for academic evaluations, a hearing is not required by the Due Process Clause of the Fourteenth Amendment." *Id.* at 87.  The Court reasoned, "[a]cademic evaluations of a student, in contrast to disciplinary evaluations, bear little resemblance to the judicial and administrative factfinding proceedings to which we have traditionally attached a full-hearing requirement." *Id.* at 90.  "Disciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians, will bear a 'resemblance to traditional judicial and administrative factfinding[.]'" *Fenje v. Feld*, 398 F. 3d 620, 625 (7th Cir. 2005).

While there is no bright-line test for determining whether a dismissal is academic or disciplinary in nature, several cases provide guidance.  In *Horowitz*, the Court held that the dismissal of the medical student was "academic" because it "rested on academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor[.]" *Id.* at 89-90.  Further, the *Horowitz* Court noted that an academic dismissal is one that involves a school's consideration of a student's personal attributes requiring the "expert evaluation . . . and historic judgment of educators," and bear "little resemblance to . . . judicial and administrative fact-finding proceedings." *Id.*  Disciplinary dismissals, on the other hand, involve "the violation by a student of valid rules of conduct" or "disruptive and insubordinate behavior." *Id.* at 86, 90.  The Supreme Court further noted that personal conduct, not merely scholarship, can determine a person's

12

fitness to be a qualified doctor and thus, can form the basis of an academic dismissal. *Id.* at 91 n.6 ("Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness.").

The Sixth Circuit agreed that personal conduct could result in an academic dismissal in *Firester v. Bd. of Governors*, No. 89-1772, 1990 U.S. App. LEXIS 12167, at *2-3 (6th Cir. Jul. 18, 1990). In *Firester*, the Sixth Circuit concluded that a medical student's conduct warranted academic dismissal after he engaged in immature behavior around patients, including asking impertinent sexual questions, touching patients in an inappropriate manner, asking a female patient on a date, and speaking in a sarcastic and critical tone to a suicidal patient. The Court reasoned: "proper attitudes toward patients are important factors in determining whether a student will be a good doctor." *Id.* at *6.

Similarly, in *Allahverdi v. Regents of the Univ. of New Mexico*, No. 05-277, 2006 U.S. Dist. LEXIS 27682 (D.N.M. Apr. 25, 2006), the Court held that a medical resident was dismissed for academic reasons where he allegedly made inappropriate and threatening comments while at work, engaged in inappropriate communications with co-workers, and was untruthful. After citing several cases dealing with this academic/disciplinary distinction, the court concluded that "federal courts have found an academic dismissal where a student's scholarship or conduct reflects on the personal qualities necessary to succeed in the field in which he or she is studying and is based on an at least partially subjective appraisal of those qualities." *Id.* at *39-40. The Court reasoned that such a broad definition of academic dismissal was necessary to "protect what the Supreme Court has stated is the 'historic judgment of educators' to evaluate their students' academic abilities." *Id.* at 40

13

(quoting *Horowitz*, 435 U.S. at 90).

In a case more factually analogous to the case at bar, the Seventh Circuit concluded that a medical resident was dismissed for academic reasons where he failed to disclose on his application and in his personal interview an earlier dismissal from another residency program. *See Fenje v. Feld,* 398 F.3d 620 (7th Cir. 2005). In its decision to dismiss, the school reasoned that a "doctor-in-training who has demonstrated a willingness to withhold damaging information when it serves his purposes cannot be fully trusted to convey all information crucial to the health of the patients committed to his care." *Id.* at 625. The Court noted "the nexus between [the resident's] lack of candor in the application process and his capacity to be trusted with patient care[.]" *Id.* The Seventh Circuit concluded that the decision was "academic" and not "disciplinary" in nature because it was "an academic judgment by school officials, expert in the subjective evaluation of medical doctors, that [the resident] did not possess the attributes necessary to adequately perform his clinical duties as an anesthesiology resident." *Id.*; *see also Martin v. Helstad*, 699 F.2d 387, 391 (7th Cir. 1983) (where student's law school acceptance was revoked on grounds that he had failed to disclose information in his application relating to past criminal history; finding it unnecessary to definitively conclude whether dismissal was academic or disciplinary, but stating that the dismissal was "colorably an academic dismissal.").

Given the above precedent, the Court finds that Schoolcraft's termination of Plaintiff from the nursing program as a result of her criminal history and lack of candor about it, pertains to her ability to function as a nurse and provide quality patient care, and thus, constitutes an academic dismissal.

Where dismissals are considered academic in nature, procedural due process does not require

14

a hearing before a decisionmaking body either before or after the termination decision is made. *See, e.g., Horowitz*, U.S. at 87-91; *Fenje*, 398 F.3d at 626; *see also Senu-Oke v. Jackson State Univ.*, 283 Fed. App'x 236, 240 (5th Cir. 2008). In the case of an academic dismissal, procedural due process is met where the student is informed of the nature of the dissatisfaction and the final decision is "careful and deliberate." *Horowitz*, 435 U.S. at 85.

b.    notice

Plaintiff's first form of notice was provided by the "Criminal History Statement" that she signed on June 16, 2010 and was a part of her application to the nursing program. (Dkt. 15, Defs.' Mot. Summ. J., Ex. 2, Pg. ID 179.) This form expressly advised Plaintiff that if anything in her criminal history revealed either: 1) a felony conviction within the 15 years immediately preceding the date of her application for admission; or 2) a misdemeanor involving abuse, neglect, assault, battery, or criminal sexual conduct or fraud or theft against a vulnerable adult as that term is defined in MICH COMP LAWS § 750.145m, or a state or federal crime that is substantially similar within the 10 years immediately preceding the date of her application, that she would be *terminated*. Further, Plaintiff understood and agreed at the time of her application that if her criminal history did not confirm her statements, it would be good cause for termination.

In late December 2010, Plaintiff received an email from Defendant Pollard that she needed to meet with her about a matter of great importance as well as a letter that expressly stated the College's reasons for terminating Plaintiff from the program. Plaintiff sent a response setting forth her position that these reasons were untrue and advising that she intended to take legal action. Thus, the Court finds no genuine issue of material fact as to whether Plaintiff was informed about the reasons for her termination.

15

*c.     careful and deliberate decision*

Consistent with its policy, Schoolcraft sent Plaintiff's criminal history form to the College Finance and Businesses Services Department to obtain a criminal background check from the Internet Criminal History Access Tool ("ICHAT"). Defendants' received the Report on December 20, 2010. It contained the following information:

1.     INCIDENT DATE: 12/26/1996: CHARGE SEGMENT: December 26, 1996, Charge of Felony Retail Fraud - First Degree (Count 1); JUDICIAL SEGMENT: January 8, 1997, Misdemeanor Retail Fraud (Count 2). (Dkt. 15, Defs.' Mot. Summ. J., Ex. 5, ICHAT Report, Pg. ID 185-88.)

2.     INCIDENT DATE: 03/06/1997: CHARGE SEGMENT:   March 6, 1997, Felony Retail Fraud (Count 1); [ ]; JUDICIAL SEGMENT: June 5, 1998, Felony Retail Fraud - Pled Guilty (Count 1); Attempt-Misdemeanor Retail Fraud - First Degree - Pled Guilty  (Count 2). (*Id.*)

3.     INCIDENT DATE: 1/21/2005: CHARGE SEGMENT: January 21, 2005, MCL 750.145 - Misdemeanor Children - Contributing to Delinquency (Count 1); JUDICIAL SEGMENT: March 10, 2005, MCL 750.145 - Attempt - Misdemeanor Children - Contributing to Delinquency - Pled Guilty (Count 1).  (*Id.*)

4.     INCIDENT DATE: 01/21/2005: JUDICIAL SEGMENT: Ordinance Violation - Disobey Policy Officer - Pled Guilty (Count 1).  (*Id.*)

Defendants based their termination decision on this ICHAT Report. (*See, e.g.*, Dkt. 15, Defs.' Mot. Summ. J., pp. 11-12.) As set forth in Dr. Pollard's termination letter, Defendants interpreted the report to mean that Plaintiff had a felony conviction within 15 years of applying to the nursing program as well as a misdemeanor conviction for violating MICH COMP LAWS § 750.145.  As Plaintiff's Criminal History Form expressly stated that she did not have any such convictions, Defendants further determined – as indicated in Dr. Pollard's letter – that Plaintiff falsified this form.

There is nothing in the record to suggest that Defendants' decision to terminate Plaintiff for

these reasons was not "careful and deliberate."  While the felony conviction referenced on the Report was 13 years prior to when Plaintiff applied to the nursing program, and not 10 years as referenced in Dr. Pollard's letter, the Criminal History Statement that Plaintiff signed makes clear that the key issue is whether the applicant has a felony conviction within the *15 years* immediately preceding their date of application.  (Dkt. 15, Defs.' Mot. Summ. J., Ex. 2, Pg. ID 179.)[2]

The ICHAT report further indicated that Plaintiff was convicted on January 21, 2005 of "Misdemeanor Children - Contributing to Delinquency pursuant to MCL 750.145."  (Dkt. 15, Defs.' Mot. Summ. J., Ex. 5, ICHAT Report, Pg. ID 187.)  This misdemeanor involving MICH COMP LAWS § 750.145 – neglect of a child – is clearly a conviction "of a state or federal crime that is substantially similar to a misdemeanor described in" MICH COMP LAWS § 750.145m – neglect of a vulnerable adult.  (Dkt. 15, Defs.' Mot. Summ. J., Ex. 2, Pg. ID 179.)

While Plaintiff advised Dr. Pollard that she disagreed with the school's reasoning, she never provided any records to Schoolcraft – or took any other steps –  to further explain and/or correct her criminal history as allowed by Schoolcraft's Student Right's Policy (Pl.'s Resp. to Defs.' Mot.

---

[2]  The record is unclear on whether Plaintiff's charge for felony retail fraud resulted in a felony conviction.  As mentioned, when Plaintiff submitted an application for reciprocity of her practical nurse license in the State of Michigan in 2005, she indicated that she had a felony conviction.  (Dkt. 15, Pg. ID 190-91.)  The ICHAT Report indicates a felony conviction out of the 41A District Court in Sterling Heights, Michigan.  This Court is aware, however, that Michigan district courts do not have jurisdiction over felony cases.  MICH COMP LAWS § 767.1; *People v. Loukas*, 104 Mich. App. 204 (1981).  It may be, therefore, that Plaintiff's plea resulted in only a misdemeanor conviction for retail fraud.  (*See* Dkt. 20, Pg. ID 456.)  Even if this is the case, the Court does not believe it creates a genuine issue of material fact as to whether the College's termination decision was careful and deliberate.  Whether this conduct resulted in a felony or misdemeanor, it needed to be disclosed by Plaintiff on the Criminal History Statement.  Moreover, whatever the status of the retail fraud conviction, it does not impact Defendants' other reasons for termination – the 2005 undisclosed misdemeanor violation involving Plaintiff's son and her dishonesty on the form.

Summ. J., Ex. A, Pg. ID 410), nor did she file an appeal as provided for in the Student Handbook (Dkt. 15, Defs.' Mot. Summ. J, p. 4 & Ex. L). Plaintiff likewise failed to provide the Court with any evidence to indicate that the Defendants' termination decision was not careful and deliberate.

Accordingly, because Plaintiff was afforded the requisite process for an academic termination, her procedural due process claim should be dismissed as a matter of law.

### 3.      Equal Protection

Plaintiff also fails to state an Equal Protection claim because she does not identify any similarly-situated individuals who were treated more favorably. Providing bare allegations, without specific instances of disparate treatment, is fatal to Plaintiff's claim on this point. *See Bell*, 351 F.3d at 252. The Court's review of the record shows that Defendants even-handedly applied their standards for handling an applicant's criminal background. For example, Defendants point out that from 2007 through 2010, three other nursing applicants who did not pass the criminal background check also did not gain admission to the program. (Pl.'s Resp. To Mot. Summ. J., Ex. Y, Pg. ID 512.) Two of these students were Caucasian (a woman and a man), and the third was an African-American male. (*Id.*; *see also* Dkt. 15, Defs.' Mot. Summ. J., p. 12 ("[T]he College has a policy and practice of cancelling the conditional acceptance of those students admitted to the Program whose criminal background histories fail to meet the entrance requirements.").) This evidence cuts directly against Plaintiff's argument that she was singled out as an African-American female student for unfair treatment based on her race or gender. Indeed, Defendants contend that had Plaintiff been forthright on her application, specifically with respect to her criminal background history, she would not have gained admission to the nursing program in the first instance. For all of these reasons, Plaintiff's Equal Protection claim fails as a matter of law.

18

#### 4.        Substantive Due Process

Plaintiff claims that she has a substantive due process right to complete her nursing education.  Two seminal U.S. Supreme Court cases assumed, without deciding, the existence of a substantive due process right to continued enrollment in dismissing the due process claim.  *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985); *Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed 2d 124 (1978).  Cases in this Circuit take a similar approach.  *See, e.g., Ku v. State of Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003) (citing *Stevens v. Hunt*, 646 F.2d 1168, 1169 (6th Cir. 1981)).

Assuming, therefore, that Plaintiff has a substantive due process interest in continuing her nursing education, to establish a violation of that right,  Plaintiff must "prove a substantial departure from accepted academic norms so as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  *See Zwick*, 2008 U.S. Dist. LEXIS 34472, at *17 n.5 (quoting *Ewing*, 474 U.S. at 225).   The right to substantive due process is much narrower than procedural due process in the academic setting.  *See Zwick*, 2008 U.S. Dist. LEXIS 34472, at *17 n.5  In fact, in *Bell v. Ohio State Univ*., 351 F.3d 240 (6th Cir. 2003), the Sixth Circuit went so far as to say that where there is no equal protection violation "we can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process."  *Id.* at 251.  Because Plaintiff's procedural due process claim fails, and because  there is no equal protection violation, Plaintiff's substantive due process claim also fails.

19

**5.     42 U.S.C. § 1985 - Conspiracy to Interfere with Civil Rights**

Plaintiff alleges that Defendants conspired to violate her civil rights in violation of 42 U.S.C. § 1985(3).  "'To succeed in establishing a § 1985(3) claim, the plaintiff must demonstrate (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'"  *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003)).  In short, a § 1985(3) complaint must "allege both a conspiracy and some class-based discriminatory animus behind the conspirators' action."  *Newell v. Brown* , 981 F.2d 880, 886 (6th Cir. 1992).  As discussed, Plaintiff has come forward with no evidence suggesting that the Defendants' decision to terminate her from the nursing program was based on any class-based racial animus or was racially motivated in any way.  The Sixth Circuit has instructed that dismissal is proper under these circumstances.  *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005)*; see also Jenkins v. Trs. of Sandhills Comm. Coll.*, 259 F. Supp. 2d 432, 445 (M.D. Tenn. 2003) (rejecting [plaintiff's] § 1985 claim because it was made in a conclusory manner and did not offer "any concrete facts to show that there was an agreement or a meeting of the minds between any of the defendants to violate [her] constitutional rights.").

Additionally, as Defendants contend, where, as here, the defendants "are members of the same collective entity, there are not two separate 'people' to form a conspiracy."  *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Ed.*, 926 F.2d 505, 509-10 (6th Cir. 1991) (granting defendants' motion for summary judgment on the 1985(3) conspiracy claim because the intra-

20

corporate conspiracy theory barred the claim). Lastly, if the substantive allegations that form the basis of Plaintiff's conspiracy claims are properly dismissed, then the conspiracy count also fails. *Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 569 (6th Cir. 2002).

For all of these reasons, the Court finds that Plaintiff's civil conspiracy claim should be dismissed as a matter of law.

### 6.    20 U.S.C. § 1703 - Denial Equal Educational Opportunity Prohibited

Plaintiff asserts a claim under "SC 1703(d) - Denial of Equal Educational Opportunity Prohibited[.]" (Dkt. 1, Compl., Pg. ID 88-90.) The Court takes this to mean that Plaintiff intended to assert a claim under 20 U.S.C. § 1703(d). Section 1703(d) states:

> No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by--
>
> . . .
>
>    (d) discrimination by an educational agency on the basis of race, color, or national origin in the employment, employment conditions, or assignment to schools of its faculty or staff, . . .

This Section, however, refers to the prohibition of racial discrimination in the employment of faculty and staff, and is therefore inapposite here. *See United States v. Sch. Dist. of the City of Ferndale*, 616 F.2d 895, 908 (6th Cir. 1980). And, even if the statute were broad enough to cover a student's claim of discrimination by faculty, for all of the reasons previously discussed, Plaintiff has failed to produce any evidence of discrimination on the part of Defendants. Therefore, Plaintiff's § 1703 claim should also be dismissed.

### 7.    20 U.S.C. § 1232g - Family Educational Rights and Privacy Act (FERPA)

Plaintiff also asserts that Defendants violated the Family Education Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, when they refused to allow Plaintiff the right to correct inaccurate or

misleading information in her education records.  (Dkt. 1, Compl., Pg. ID 69-71.)  Plaintiff alleges

that the College's failure to allow her to correct her criminal history and the December termination

letter alleging a felony conviction amounted to a FERPA violation.  (*Id*.)  However, this Circuit has

made clear that there is no private right of action under FERPA.  *See Bevington v. Ohio Univ*., 96

Fed. App'x 748, 750 (6th Cir. 2004) (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287, 153 L. Ed.

2d 309, 122 S. Ct. 2268 (2002); *United States v. Miami Univ*., 294 F.3d 797, 809 n.11 (6th Cir.

2002)).  In *Gonzaga Univ. v. Doe*, the U.S. Supreme Court expressly held that FERPA violations

are not actionable either directly under FERPA, or under 42 U.S.C. § 1983:

> FERPA's nondisclosure provisions contain no rights-creating
> language, they have an aggregate, not individual, focus, and they
> serve primarily to direct the Secretary of Education's distribution of
> public funds to educational institutions.  They therefore create no
> rights enforceable under § 1983.

*Gonzaga*, 536 U.S. at 291; *see also United States v. Convertino*, Case No. 06-20173, 2008 U.S. Dist.

LEXIS 37501, at *11 (E.D. Mich. May 8, 2008) ("As to the FERPA violation, FERPA provides no

private cause of action, nor any basis for this Court to act.").  Because Plaintiff has no private right

of action under FERPA, this claim should also be dismissed.

## B.    State Law Claims

Because the Court recommends dismissal of Plaintiff's federal claims and this case does not

involve diversity, the Court further recommends that the District Court decline to exercise

supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over Plaintiff's remaining state law

claims.  *See, e.g., United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("If the federal

claims are dismissed before trial . . . the state claims should be dismissed as well."); *Brandenburg*

*v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) (affirming the district court's decision

to decline supplemental jurisdiction over the remaining state law claims in the case).

## IV.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that Defendants' Motion for Summary Judgment be GRANTED as to Plaintiff's federal law claims.  The Court further finds it appropriate to decline supplemental jurisdiction over Plaintiff's state law claims and therefore RECOMMENDS dismissal of those claims WITHOUT PREJUDICE.

## V.   FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

Date:   October 22, 2012                                   s/Laurie J. Michelson
                                                           Laurie J. Michelson
                                                           United States Magistrate Judge

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 22, 2012.

s/Jane Johnson _____
Deputy Clerk